IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION


UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )   Docket No. 3:19-cr-00302
                                   )
          vs.                      )   Columbia, SC
                                   )
                                   )
KENYADA JAQU,                      )
                                   )
          Defendant.               )
_____)   DATE: December 2, 2021


BEFORE THE HONORABLE J. MICHELLE CHILDS
UNITED STATES DISTRICT JUDGE, PRESIDING
SENTENCING HEARING


A P P E A R A N C E S:

For the Plaintiffs:

KATHERINE FLYNN
U.S. Attorneys Office
401 W Evans Street
Suite 222
Florence, SC 29501
843-665-6688
Email: Katherine.Flynn@usdoj.gov


For the Defendants:

J. CHRISTOPHER MILLS
J Christopher Mills Law Office
P.O. Box 8475
Columbia, SC 29202
803-748-9533
Email: chris@chrismillslaw.com


COURT REPORTER:                    KAREN V. ANDERSEN, RMR, CRR
                                   United States Court Reporter
                                   901 Richland Street
                                   Columbia, SC  29201

2

THE COURT:  Government, you may call your in the case.

MS. FLYNN:  Thank you, Your Honor.  Next case on the docket this morning is United States of America v. Kenyada Jaqu.  It's case 3:19-302.  Mr. Jaqu is present in the courtroom this morning represented by Mr. Mills.  And we are here for sentencing in this matter.

THE COURT:  Okay.  Mr. Jaqu, if you raise your right hand to take the oath.

THE COURT DEPUTY:  State your name for the record.

THE DEFENDANT:  Madam Court Reporter -- good morning.

THE COURT:  Good morning.

THE DEFENDANT:  Who's the court reporter?

THE COURT:  I mean, she's taking down everything, but there's no direct communication with her.  Is there something you would like to state?

THE DEFENDANT:  Yes.  Please let the record show that I do not consent to nor do I wish to contract with this Court on the terms of being subject to this jurisdiction.  I stand under God's jurisdiction, under God's law, not man's statute and codes.  Though I respect them, I stand not under them.

I'm Kenyada Louis Jaqu, made of flesh and blood, living and breathing Moorish American National.  Furthermore,

I do not consent to nor do I give authority to attorney and bar member Chris Mills to speak on my behalf, nor on the behalf of, all capital letters, Kenyada Jaqu, which is recorded for public record with the Office of the Secretary of State under File No. 202106148621.  Again, I do not consent to nor do I wish to contract with this Court.

THE COURT:  Okay.  You do understand that we are -- and, first of all, we still haven't administered the oath to him, correct?  So let's do that.

I understand that that is your statement, but I still need her to officially relay the oath to you.

THE COURT DEPUTY:  Please state your name for the record.

THE DEFENDANT:  I do not consent --

THE COURT:  The question is what is your name.

THE DEFENDANT:  -- to contract with this Court.

THE COURT:  The question is, what is your name?

THE DEFENDANT:  If I state -- if I give this Court a name without entering into a contract with it --

THE COURT:  You have indicated your desire to not contract with the Court.  No person contracts with the Court anyway, but right now the issue is just telling us your name.

THE DEFENDANT:  Again, if I give a name to this Court --

THE COURT:  You are --

THE DEFENDANT:  -- I enter into a contract.

THE COURT:  Nobody enters into a contract with the Court.  So that's not relevant anyway.  But your name is just letting us know that you are the person who has been presented today.

THE DEFENDANT:  I am not that person.

THE COURT:  Okay.  You are not Kenyada Jaqu?

THE DEFENDANT:  I am not the person on this Court's paperwork.  I am not.

THE COURT:  Okay.  Then who are you?

THE DEFENDANT:  I'm of flesh and blood, living and breathing Moorish American National.

tHE COURT:  Okay.  You do understand that we are here at a sentencing procedure as a result of you having gone through a trial and then getting convicted by a jury?

THE DEFENDANT:  I do not wish to contract with this Court.

THE COURT:  Okay.  But you were that person who went through the trial; is that correct?

THE DEFENDANT:  No, ma'am.

THE COURT:  Okay.  But you were here physically with another attorney and you watched a trial take place that was resulting in allegations as a result of an indictment that was alleged by you by a grand jury with respect to certain offenses.  The case was presented in the court.  And then a

jury then later on convicted you.

To be more specific, the offenses were Count 1, possession with intent to distribute and distribute 100 grams or more of heroin and a quantity of methamphetamine; Count 2, felon in possession of a firearm and ammunition; Count 3, possession of a firearm in furtherance of a drug trafficking offense; and Count 4, conspiracy to possess with intent to distribute and distribute 100 grams or more of heroin and a quantity of methamphetamine.

I understand that you have made your statement disagreeing that you were that participant and disagreeing that you are Kenyada Jaqu perhaps today, and that you don't believe that you fall under the jurisdiction of the court. But according to our federal laws, this proceeding occurred in a proper manner in that there was a grand jury who received evidence with respect to the potential indictments and witnesses conferred, issued a true bill as to certain counts of the indictment.  A jury was convened because you decided not to plead, which is absolutely your right.  You were advised of those rights along the way.  There were times when you wanted to have issues with respect to other counsel. You have a different counsel here than you did for the trial. So that issue was granted for you.

The jury verdict was as to Counts 1 through 3 of the superceding indictment.  And that was entered on October 21,

2020.  And then a jury verdict of guilty was also as to the lesser-included offense contained in Count 4 of the superceding indictment, and that was entered on October 21, 2020.

This is also as a result of you having been arrested in October of -- excuse me, in August of 2015 by state authorities for six state offenses which were considered conduct related to the instant federal offenses, and bonds were executed, et cetera.  And then you were eventually in federal custody.

So what I have before me is a pre-sentence investigation report that outlines the investigation.  It outlines the charges.  It outlines your criminal history as well as the conduct related to these particular offenses.  It provides certain information about you, as well for the Court to consider with respect to sentencing.

And so I am going to go over what the pre-sentence investigation report has relayed with respect to the investigation in this case, the jury verdict, as well as the probation department's computation of what should be your guideline computations.  And I understand that there are some objections lodged in this respect.  And we will go over those as well.  But this is, again, to inform you, who is before me, of these particular issues.

So as to Count 1, possession with intent to

distribute and distribute 100 grams or more of heroin and a quantity of methamphetamine, in Count 4, conspiracy to possess with intent to distribute and distribute 100 grams or more of methamphetamine, that pursuant to the guidelines, Counts 1 and 4 have been grouped together. And so your -- because they correspond to an aggregated quantity, and this is what we are talking about with respect to the drugs, so your base offense level for that is 32, because that's based on the equivalent drug weight of 3,000 kilograms or more, but less than 10,000 kilograms.

Then we added two levels because you maintained a premises for the purpose of manufacturing or distributing a controlled substance. And then another two levels was added in you having an aggravating role by engaging in written intimidation or otherwise obstructing justice in connection with the investigation or prosecution of the offense.

Then there was another three levels added in that you were considered an organizer, manager, and supervisor of at least one or more participants in criminal activity involving five or more participants. So that gave you an adjusted offense level of 39.

Then we move on to Count 2, which is felon in possession of a firearm. Your base offense level for that is a 24, because you committed the offense after having already obtained at least two felony convictions for a controlled

substance offense and crime of violence.

Then two levels were added because there were at least three but not more than seven firearms.  Another two levels were added because the firearm was stolen.  And so then that takes us to a cross-reference offense of 36 because the computation of the guideline resulted in a higher guideline level than originally calculated, so this guideline offense level becomes a 36.

There was an adjustment in your role in the offense because there were other participants in the criminal activity involving five or more participants.  And so you have an adjustment for obstruction in your related adjustments in that you willfully failed to appear as ordered for a judicial proceeding.  I mean -- excuse me.  So those added together, the 36, plus the 3, is equal to an adjusted offense level of 39.

So we always look to grouping all of the offenses. So you've got Counts 1, 2, and 4.  It becomes a 39 because we take the higher of the offenses.  And I indicated to you in my earlier presentation that for Counts 1 and 4, your adjusted offense level was 39.  For Count 2, it was a 36. But the law requires that you combine them together, and then you go with the higher.  So that led us to a 39.  And so that would be, you know, considered what the offense level enhancement would be for those.

Then for Count 3, possession of a firearm in furtherance of a drug trafficking crime, if you've been convicted of 18 U.S.C. Section 924C as in this regard, you would be determined to be a career offender under U.S. Sentencing Guidelines Section 4B1.1(a). And so, therefore, the guideline range that has been determined then would have added another 60 months to that particular guideline range.

So now I move forward to the guideline range. And under your offense level of 39, your criminal history category of XI based on prior offenses, you would not be eligible for probation, but instead, be in Zone D, which requires a period of incarceration. This guideline range requires 420 up to life imprisonment, based on your status as a career offender and an armed career criminal pursuant to the U.S. Sentencing Guidelines, followed by eight years of supervised release, two to five years on Counts 2 and 3, but one on Count -- eight years on Counts 1 and 4. But they would be served together, or concurrently.

You don't owe any fine due to your inability to pay. And you do now owe restitution in this regard as well. So that is what the pre-sentence investigation report informs us about. So now you can have a seat. And I will listen to the lawyer with respect to any potential objections to the guideline calculation.

THE DEFENDANT: With all due respect, I do not

consent. And I do not give authority to Chris Mills to speak on my behalf nor on my all capital --

THE COURT: I understand your statement. It's on the record.

THE DEFENDANT: This is not my attorney. Please let the record show that this is not my attorney. I do not consent to this Court.

THE COURT: Okay. Thank you.

Mr. Mills.

MR. MILLS: May I remove my mask?

THE COURT: Yes.

MR. MILLS: Thank you. Preliminary matters just for the record, as the Court is aware, the Court appointed me to represent Mr. Jaqu after his conviction and after the release of Ms. Breeden as his counsel. As a result of that appointment, I went out to see Mr. Jaqu to talk with him about this case. He indicated that he did not accept my representation. He did not want me to do so. I explained to him that I was appointed after his application for pro se had been rejected. I then informed the Court of Mr. Jaqu's position. And the Court issued a subsequent order. I think it's at docket entry 264, which I have provided to Mr. Jaqu indicating that I'm his attorney of record and I am authorized to speak on his behalf pursuant to the Court order.

I have a responsibility to the Court. I made numerous attempts. I had several other clients out at Sumter Lee. And when I went out to see them, I always offered to see Mr. Jaqu. He did not come out to see me. And so I was not able to have any communication.

Obviously, I spoke with Jason Peavy originally, which when I was appointed in this case, who was representing the Government in the matter. I've spoken with probation office, Mr. Schirra. And, obviously, more recently with Ms. Flynn, who has taken over the role for the U.S. Attorney's Office.

In November when I received notice of the sentencing hearing, I immediately wrote Mr. Jaqu and informed him that the sentencing hearing was going forward. I again offered to go meet with him. I provided my number for him to call my office. And I explained to him in the original letters some of the anticipated issues we had with the Court. I sent him a copy of the objections that had been filed by Ms. Breeden for him to review and, again, offered to go out and discuss those in detail with him in what they would be presenting.

Specifically, when the Court changed the sentencing date from December 7th to December 2nd, I wrote him again advising him of the change of sentencing date, and again offering for me to come out and meet with him at his request.

I did advise him that the Government's position in

this case, and as, of course, expressed in the probation office's response to the objections, is that they believe that the disposition of the first two objections dealing with acceptance of responsibility and the armed career criminal classification might dispose of the need to address the other objections.  Again, I was not able to get any feedback from Mr. Jaqu about that or any other.  So I just wanted to put that on the record.

As the Court -- turning now to the actual objections here, I will ask direction from the Court how you would like me to proceed.  I'm, of course, prepared to argue 1 and 2, which are legal issues almost exclusively.  It would not require any testimony.  The other ones are challenges to weights and testimony.  If the Court has those objections, again, my understanding is that would require the Government to put forth evidence.

THE COURT:  Yeah, I think we should go with the legal objections first, just because if those are controlling, then it might not -- it may obviate the need for the other.

MR. MILLS:  Right.  I will just explain this to Mr. Jaqu since I have an opportunity to address him in open court at least, those other objections, should he -- and I'm sure -- of course, my obligation is to file an appeal after this sentencing hearing is over, that should this case get

reversed on appeal or come back there either for sentencing issues or for retrial, that those objections would then be addressed at that time if there's an error in the acceptance of responsibility and/or the armed career decisions.

So with that background, Your Honor, the two objections that we are dealing with here, the first is the adjustment for acceptance of responsibility. I've noted that the Government's case, as was referenced earlier, the Court referenced earlier, goes back to original state involvements back in '15 and '16. Mr. Jaqu did cooperate with the Government at that time, and extended numerous interviews and proffers with the Richland County Sheriff's Department and cooperated. Ultimately, that became a federal prosecution. He did sign a proffer agreement. And I do not believe that they were ever able to conduct a proffer interview with him at that time.

I think, as Ms. Breeden stated in the objection, Mr. Jaqu, of course, has his Sixth Amendment right to demand the Government be put to a test, that he should not be punished for having them be put to their burden of proof. And while he can accept some level of guilt for what he actually did, I think it's perfectly within his right and appropriate for him to challenge the weight that the Government attributed.

So in sum, the argument is that he has cooperated. He has admitted involvement. There was a dispute with the

Government about the weight. But the weight on the edges should not obscure the fact that he fundamentally cooperated with the Government at the early stages of this litigation. And I think under those circumstances, he would deserve to get an acceptance of responsibility.

THE COURT: Okay. Let's start there.

MS. FLYNN: Your Honor, acceptance of responsibility is covered under guideline 3E1.1. And it is said that it is for a defendant who clearly demonstrates acceptance of responsibility. Application note 1 further defines what that means. It says it is for a defendant who has truthfully admitted to his offenses. Mr. Jaqu, as noted in the PSR, as noted in the response to these objections, has never truthfully admitted to these offenses. He is still contesting.

He did enter a proffer with the Government. That part is correct. In April, I believe of 2019, he actually sat for a proffer interview. And at that point, he did say that he was involved in this conduct.

Following that, he refused to sit for a second proffer interview. The Government then attempted to conduct a polygraph with him. He refused to come with the Government agents for a polygraph, at which point the Government filed a motion to breach his proffer agreement. And this Court held that he was, in fact, in breach of that proffer. So he has

15

not truthfully admitted to his offenses and truthfully accepted responsibility for what he has done.

Application Note 2 to Guideline 3E1.1 states that the credit for acceptance is not intended to apply to a defendant who goes to trial, is convicted, and then admits a level of guilt or remorse.

That application note does contain an exception. But that exception is for a defendant who goes to trial on the legal grounds, not a defendant, as Mr. Jaqu continues to do, who is contesting the factual basis underlying his conviction.

So on that basis, we would state that Mr. Jaqu does not fit the criteria for a defendant who should receive credit for acceptance of responsibility. And, therefore, the Court should overrule objection 1.

THE COURT:  Okay.  And I will overrule that objection based on the Government's arguments, but also based on what we are hearing here today that Mr. Jaqu is not even admitting his name, let alone that he committed the offenses or that he was convicted by a jury.

Okay.  So next.

MR. MILLS:  Your Honor, all right.  Thank you. Moving on, Section 2 deals with, of course, the Armed Career Criminal Act.  Your Honor, it is Mr. Jaqu's position that since the Armed Career Offender Act greatly increases his

punishment, that those issues have to be submitted to a jury pursuant to the line of cases of Apprendi En Linea (ph) -- excuse me, *Alleyne*. And the exception that was noted in Al -- excuse me, *Almendarez-Torres*, does not apply in this instance.

And not challenging necessarily the underlying convictions which are being used, but those should have been submitted to the jury under the Sixth Amendment and under the Supreme Court case law. Thank you.

THE COURT: Okay.

MS. FLYNN: Your Honor, as noted in the probation office's response, *Almendarez-Torres* is a specific exception to the general *Apprendi* rule. And it specifically excepts a prior conviction from going to the jury. That does not need to go to the jury. Therefore, and *Almendarez-Torres*, of course, is the exception to the general *Apprendi/Alleyne* line of cases.

Your Honor, the Fourth Circuit, as noted in probation's response, has upheld the continued viability, the continued legal standing of *Almendarez-Torres* in both *Bell* and *White* as recently as this year.

And, Your Honor, so for that reason, we would say that Objection No. 2 should be overruled.

THE COURT: I agree based on the probation's response as well as the response by the Government that that

is pretty clear law of what the Court's intention is, specifically United States Supreme Court's intention was in *Almendarez-Torres vs. United States* and other cases also cited there.

All right.  Next.

MR. MILLS:  Then, Your Honor, simply for the record, I would note the other objections which have been filed.  I would, on Mr. Jaqu's behalf, suggest that those should be heard.  I understand the Court's position on that, but I wanted to place that on the record as another issue.

THE COURT:  Okay.  And just generally, based on these rulings and, of course, I will hear from the Government, it keeps the guideline calculation intact because of the armed career criminal status as well as the career offender status.  So when you are starting at that high level, that gets us at 300 years up to life.  But then add on the 60 as well for the gun charge, or 360 plus the 60, that gets us to 420 up to life imprisonment.  We are still at that high level, regardless.

MS. FLYNN:  Correct, Your Honor.  So having sustained -- excuse me, overruled the objection to the Armed Career Criminal Act, and if the Court finds that, in fact, Mr. Jaqu is a career offender, as noted in the presentence report, then those two factors under the guidelines drive a sentence of 360 to life, plus the 60 consecutive on the

924(c), which brings us to the 420 to life, 420 months to life that Your Honor noted earlier.

Essentially, those two criminal history pieces, the career offender and the Armed Career Criminal Act status, are what is driving that sentence.

And so, therefore, having ruled on the first two objections, the remaining objections become objections under Federal Rule of Criminal Procedure 32 that the Court need not rule on because they do not impact the guidelines.

THE COURT:  Okay.  And then if probation has any comment --

PROBATION OFFICER:  Your Honor, I wanted to make one note that he's a 39 as to Count 1 and Count 2.  And that is just based off of, yes, the conduct that was attributed to him through the guideline calculations.  If we just focus on career offender applicability, as to Count 1, his guideline would be reduced to 37.  37 still counts.  Calls for a 360 to life.  Same thing as to Count 2.  It would come down from a 39 to a 37 when we are just looking at armed career criminal applicability, again, still 360 to life.

And then we go to Count 3, taking the highest guideline range of either the chart and 4B1.1 or taking those 360 lifes and adding 60 months, and he is still 420 to life.

So I just wanted to make a note it would lower his guideline to a 37 as to Counts 1 and 2, but we are still at

the same total guideline calculation as far as the range.

THE COURT:  And I think that's even more important, that even given the benefit of the doubt in that regard, if we are still at that same guideline level, all of the other objections that relate to potential factual inconsistencies and things of that nature are not going to impact the guidelines in a positive way that would benefit Mr. Jaqu.  So having ruled on the legal issues that remain him in armed career criminal and career offender status, we will make the guidelines still remain at this level.  So that's what I would go for.

And then under Rule 32, we need not delve with the remaining objections.

MR. MILLS:  Thank you, Your Honor.  I just wanted to put it on the record.

THE COURT:  All right.  So now we are at the point where the Government would discuss sentencing, you know, in terms of the factors.  And then, of course, Mr. Mills, and then if Mr. Jaqu wishes to respond as well, we are going to hear that.

MS. FLYNN:  Your Honor, the Government takes the position in this case that a sentence at the low end of what is now the guidelines range, that 420, is appropriate in this case.  Your Honor, what's encompassed here is serious conduct.  It is a multi-year, multi-drug conspiracy in the

Columbia area.  As noted in the PSR, in the course of that conspiracy, Mr. Jaqu is accountable for approximately 4400 kilograms of converted drug weight.  As noted in the PSR, Mr. Jaqu is accountable for multiple firearms during the course of that conspiracy.

Your Honor knows that distribution of narcotics comes with a danger to our communities.  Illegal possession of firearms comes with a danger to our communities.  But when those two are combined, there is an expanded -- an exponential danger.  When drug trafficking plus illegal possession of firearms are added together, that is a high danger to our communities.

Your Honor, as noted in the PSR, Mr. Jaqu has a long and a full criminal history.  It includes convictions for narcotics crimes, for robbery crimes, for firearms crimes. And he previously received some lengthy sentences.  But, apparently, that did not deter him from further conduct.  As Your Honor noted, this case dates back to 2015 and some state charges that became relevant to the charges in this case. Your Honor, Richland County bonded him out on those charges, and he absconded.

He then was brought back into custody by Richland County, served time, was released in November of 2018, and went right back to dealing.  Your Honor, he was caught in a traffic stop that becomes the basis of Count 1 in this case

in March of 2019, so four months after Richland County released him.

Your Honor, he was caught in a traffic stop with his then significant other, who, as Your Honor remembers, he then pressured to take the charges in this case. He asked her to essentially alleviate his culpability. He asked her to put in an affidavit that it appears he intended to have presented to the Court alleviating his culpability in this case.

We've talked about the seriousness of the conduct in this case. We've talked about Mr. Jaqu's criminal history. I would note we are at level 396. It doesn't get much more serious than that, Your Honor.

And so to reflect the offense, what happened in this case, to reflect Mr. Jaqu's criminal history, to reflect the seriousness of the charges in this case, to promote responsibility, protect the public, and deter Mr. Jaqu from further criminal conduct, we take the position that the 420 months, the 360, plus the consecutive 60 on the 924(c), is the appropriate sentence in this case.

THE COURT: Thank you.

Mr. Mills?

MR. MILLS: Your Honor, I'm a bit hamstrung from my inability to communicate with Mr. Jaqu about the arguments that he would like me to place before the Court at the sentencing or any background. I know the Court has read the

PSR, is aware of the circumstances of his upbringing here in Columbia, that he has four children.

I would also, without getting on the soapbox, and realizing this is not the forum and the Court doesn't have the authority, that the federal system is a rather draconian system as far as sentencing goes.  And the idea of 420 months for -- I understand the severity of the conduct that Ms. Flynn has just outlined, but that is often reserved for people who commit murder and take life.  And I do not believe Mr. Jaqu is in that position.

We would ask the Court to, obviously, go to the bottom of the guideline range in this instance.  And I think the rest is for the Court at this point.

THE COURT:  Okay.

PROBATION OFFICER:  Your Honor, just to preserve the record for appellate reasons, Ms. Flynn mentioned 39.  If we are foregoing the rest of the objections, I do think the Court might want to rule that the actual total offense level is 37 rather than 39, since we are purely basing that base offense level off of his armed criminal career applicability, just to avoid potential issues down the road.

THE COURT:  State the 39 going to 37 because of what again?

PROBATION OFFICER:  So the total offense level of 37 as to Count 1 is going to be based off of 4B1.1 and being a

career offender as to Count 1.

As to Count 2, he would be a 37 under a 4B1.1(b)(2) in that he's an armed career criminal. So we are -- we are not counting any specific offense characteristics or anything of that nature.

And then Count 3, we would be adding 60 months as to the 37, which is 360 to life still, which gives us the 420 to life.

THE COURT: All right. So I would decrease the total offense level from 39 to 37 as to Counts 1 and 2. Under Count 1, he would still be deemed a career offender.

Under Count 2, he would be deemed an armed career criminal.

And then 60 months would be added as to Count 3 because of the 924(c)?

PROBATION OFFICER: Yes, Your Honor.

THE COURT: Okay. So that would -- to get from 39 to 37, then we are alleviating certain specific offense characteristics?

PROBATION OFFICER: Yes, Judge.

THE COURT: All right. Noting that, it still does not change the amount of months, but it still brings his offense level down. So I'm happy to oblige in that regard.

All right. Sir, do you wish to make any statement?

THE DEFENDANT: Again, let the record show that I do

not consent to this Court, nor do I wish to contract with this Court on the terms of being subject to this jurisdiction.

THE COURT:  Okay.  Thank you.

All right.  So my statement then would be, I'd accept the sentencing factors and statements as indicated by the Government.  I would remind that in this indictment, which is Docket No. 3:19-CR-00302-001, which reflects United States of America v. Kenyada Jaqu, a/k/a Ken, states that this person is before the Court for purposes of sentencing, having been found guilty beyond a reasonable doubt because of a jury verdict on October 21, 2020, as to Counts 1 through 3 of the superceding indictment, and as to the lesser-included offense contained in Count 4 of the superceding indictment.

This investigation also shows that beginning in and around the summer of 2014 and continuing through March 11th, 2019, Mr. Jaqu was a member of a drug trafficking conspiracy which distributed quantities of varying controlled substances around South Carolina and Georgia while in possession of firearms.

And then over the course of the multi-year investigation, law enforcement conducted multiple controlled drug purchases, performed extensive physical surveillance, and executed multiple searches of vehicles, hotels, and residences, which Mr. Jaqu utilized to facilitate his drug

distribution activities.  During the searches, law enforcement seized digital scales, four firearms, body armor, ammunition, distribution baggies, large sums of money, and multi-large quantities of heroin, crack cocaine, cocaine, and ethylone.

There were several interviews with certain persons. And they further corroborated Mr. Jaqu's involvement in a conspiracy to distribute drugs while in possession of firearms.  Law enforcement also learned from co-conspirators that Mr. Jaqu utilized other individuals to broker, transport, and facilitate drug transactions on his behalf.

There were also other interviews, including with co-defendant Ronda Barker, and an inmate George McDowell, that they discovered Mr. Jaqu had instructed Ms. Barker to make a false statement concerning evidence material to the investigation of the instant offense, and attempted to have her take responsibility for his criminal charges, which is even further support to deny the objection on the acceptance of responsibility.

I've been with this case the entire time.  I did hear Ms. Barker's testimony herself.  So I've ruled on the particular issue with respect to whether or not he violated or breached his proffer agreement in that regard.

Then with respect to law enforcement as well, they have conducted several other interviews, but, essentially,

all of those interviews summarized that Mr. Jaqu was responsible for transporting multiple kilograms of heroin from New York to South Carolina for the purpose of distribution.

He also has a significant criminal history which dates back to 1995. He has prior felony convictions for failure to stop for a blue light, criminal conspiracy to commit armed robbery, attempted armed robbery, assault and battery of a high and aggravated nature, accessory to a felony after the fact of armed robbery, attempted strong-arm robbery, possession with intent to distribute marijuana, possession with intent to distribute crack cocaine, two counts of crack cocaine possession, possession of a stolen pistol, possession of other controlled substance in Schedule I to V, and MDP narcotic drugs in Schedule I, and LSD in Schedule II, and then also offenses for narcotic drugs in Schedule I(b) and (c), LSD and Schedule II, and then three counts of distribution of heroin, and conduct as part of the instant offenses. He's also had misdemeanor convictions for simple possession of marijuana, two counts of driving under suspension, and unlawful carrying of a pistol.

And since he had at least two prior convictions for a controlled substance offense or a crime of violence, he was designated as a career offender as well as an armed career criminal pursuant to United States Sentencing Guidelines

4B1.1 and 4B1.4, since he has had at least three prior convictions for either a violent felony or a serious drug offense. And that last characterization refers to the armed career criminal status.

Those are offenses I'm listing. Some may have been left out, but I think we get the picture about the serious nature of the prior criminal record.

And then he committed this offense while on state probation for prior multiple other offenses. So that's very significant in this regard.

We understand that Mr. Jaqu has one adult child and three minor children. He had resided in Columbia, South Carolina since his release from state prison in November of 2018. Overall, fair physical health due to a genetic heart condition, accompanied by hypertension and kidney failure. So those, you know, types of things will be taken into consideration by the Bureau of Prisons.

He was not under the care of any mental health professionals and does not currently take anything with respect to any mental health or emotional health disorders. No formal diagnosis with respect to any complaints with respect to any mental health issues.

He did obtain his GED while incarcerated in 1988 and has some college, but has essentially been unemployed since 2010, and only held short terms of employment, essentially,

on two occasions in his lifetime.

As far as we know, he's not associated with any member of any criminal gangs or organizations, but he has revealed sovereign citizen ideologies, as indicated today and then in prior motions with respect to the Court challenging the Court's jurisdiction.

So, Mr. Jaqu, please stand for sentencing. So having calculated and considered the advisory sentencing guidelines and having also considered the relevant statutory sentencing factors contained in 18 U.S.C. Section 3553A, it's the judgment of the Court that the defendant, Kenyada Jaqu, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 420 months. That consists of 360 months as to Count 1, 360 months as to Count 2, and 360 months as to Count 4. And these terms will run concurrently, in other words, at the same time.

And that will be followed by 60 months as to Count 3, that is to run consecutively to the previously imposed terms, so follow the 360 months.

It appears you don't have the ability to pay a fine, therefore, your fine is waived. You will pay a mandatory $400 special assessment, which is $100 per count. And that's due and payable immediately.

Upon release from imprisonment, you will be placed on supervised release for a term of eight years, consisting

of eight years as to Counts 1 and 4, and five years as to Counts 2 and 3. And that will also run concurrently. So you will serve it at the same time.

You will report to the probation office in the district to which you are released. And you will do that within 72 hours of release from the Bureau of Prisons.

While on supervised release, you will comply with mandatory and standard conditions as outlined in 18 U.S.C. Section 3583(d) and United States Sentencing Guidelines Section 5D1.3(c). And standard conditions of supervision 1 through 9 and 13 will serve the statutory sentencing purpose of public protection and rehabilitation pursuant to 18 U.S.C. Section 3553(a)(2)(C) and (D). And standard condition of supervision 10 and 12 will serve the statutory sentencing purpose of public protection pursuant to 18 U.S.C. 3553(a)(2)(C). And standard condition of supervision 11 ensures that you do not engage in activities that may potentially conflict with other conditions of supervision or that may pose risk to your probation officer.

With respect to the preliminary order of forfeiture, does the Government wish to speak to that?

MS. FLYNN: Your Honor, the Government did enter -- file a preliminary order, and it would ask that it be incorporated into the judgment in this case.

THE COURT: Okay. That motion is granted.

Mr. Jaqu, you will also comply with the following special conditions, and that is substance abuse testing and treatment. To the extent that he qualifies for it while incarcerated, I will allow that as well, just because any help in that regard. And then I'm also going to require cognitive behavioral therapy while incarcerated and during supervised release.

Probation.

PROBATION OFFICER: Yes, Your Honor, I apologize. Paragraph 169 of the presentence report, I just wanted to make the Court aware, I had recommended a departure, a downward departure in this case. Mr. Jaqu did serve, as I calculated, 542 days, or approximately 32 months on the state conduct.

THE COURT: And we want to make sure he gets his credit, I agree.

PROBATION OFFICER: So with that calculation, it's math, it would be 328 months --

THE COURT: Okay.

PROBATION OFFICER: -- as to Counts 1, 2, and 4, 60 months as to Count 3, which gives us a total of 388 months, if Your Honor wanted to impose that departure.

THE COURT: Sure. I mean, definitely, I want him to get his appropriate credit for time. Any objection by the Government?

MS. FLYNN:  None, Your Honor.

THE COURT:  Okay.  So the sentence will be 328 months as to Counts 1, 2, and 4, and then the consecutive 60 months as to Count 3.

PROBATION OFFICER:  Your Honor, just for the record, that is a departure pursuant to 5K2.23.

THE COURT:  Thank you.  Okay.  Definitely want to give you credit for the time you served.  Okay.  You, obviously, did not waive your right to appeal.  And you've indicated potentially there may be an appeal here.  So make sure Mr. Mills is alerted of that.  If you want to appeal, you --

MR. MILLS:  Your Honor, I'm sorry to interrupt. Since Mr. Jaqu has refused to communicate with me in any kind of meaningful way, I would ask the Court just to address that issue.  Obviously, as an attorney, I will file a notice of intent to appeal on his behalf to protect his rights.

THE COURT:  Sure.

MR. MILLS:  But I just wanted to make him aware of that in court so that they would appoint separate counsel for him on appeal to handle his appeal, and that he would have a right to consult with that attorney and pursue all avenues of relief that he thinks are appropriate to overturn his sentence and his conviction.

THE COURT:  Okay.  So, Mr. Jaqu, Mr. Mills was

formally appointed to represent you through this proceeding. He will go ahead and file a notice of appeal just so that your rights are protected. But he, after this proceeding, will no longer be your counsel, because there's an appellate division with respect to the federal public defender's office. And so they would then communicate with you for you to determine whether or not you wish to pursue an appeal, continue along that line and/or what potential grounds there might be. So that will be up to you to communicate your thoughts and how you wish to proceed. Do you understand that?

THE DEFENDANT: Let the record show, as I stated earlier, I am Kenyada Louis Jaqu Payne, not Kenyada Jaqu. I do not accept sentencing. I still do not consent to this Court --

THE COURT: Okay.

THE DEFENDANT: -- or this jurisdiction. Please let the record show I will be appealing all sentences.

THE COURT: Okay. And that's what we've indicated here, that you are giving your notice now. So, obviously, you understand your right to appeal. And then you will get further communication by Mr. Mills noting that the notice of appeal has been filed and then further communication by the other attorneys with respect to the appeal, which would include your ability to communicate with them about you not

accepting the jurisdiction of the Court.

MR. MILLS:  Your Honor, just so, again, he understands that the notice of appeal is just generally a notice --

THE COURT:  Just generally.

MR. MILLS:  -- that specific issues have to be discussed with him and the appointed counsel to determine what issues would be appealed and what issues they will brief.  And so the notice of appeal does not bind him in any way --

THE COURT:  No.

MR. MILLS:  -- to any specific course of conduct --

THE COURT:  No.

MR. MILLS:  -- on the record, at the trial, at this sentencing, and those issues can be reviewed independently.

THE COURT:  Yes.  That's correct, sir.  It's just a general notice of an intent to appeal.  And then the issues that will be specific to the appeal would be determined later, because, obviously, a lawyer would have to have communication with their counsel and/or the -- I mean, with their client, and/or if the client determines that they wish to proceed on their own at a later date, that would be, you know, something to discuss later.

MR. MILLS:  That was the only other point I was going to make, that if he had an issue with the appointed

counsel, he would have to address that to, I believe, the Fourth Circuit. And they would make a decision whether to appoint new counsel and/or allow him to represent himself on appeal.

THE COURT: Correct. Okay. All right. I find this sentence sufficient but not greater than necessary to achieve the sentencing factors. Is there any objection to the form?

MS. FLYNN: None, Your Honor.

MR. MILLS: No, Your Honor.

THE COURT: Okay.

THE DEFENDANT: Let the record show I do not consent.

THE COURT: Thank you. That concludes the proceedings. Thank you.

(Whereupon, the proceedings are adjourned.)

CERTIFICATE OF REPORTER

I, Karen V. Andersen, Registered Merit Reporter, Certified Realtime Reporter for the State of South Carolina at Large, do hereby certify that the foregoing transcript is a true, accurate and complete Transcript of Record of the proceedings.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Karen V. Andersen
Registered Merit Reporter
Certified Realtime Reporter